Broyles, C. J.
The South Georgia Railway Company, a corporation with headquarters in Quitman, Georgia, brought suit in the superior court of Brooks County against Manufacturing Lumbermen’s Underwriters, a nonresident corporation with headquarters in Kansas City, Missouri, on a policy of fire insurance, for a loss by fire of a building insured under said policy. When the case came on for trial, on the 10th day of May, 1937, and before the trial proceeded, the attorneys who had theretofore appeared generally for the Manufacturing Lumbermen’s Underwriters appeared specially as amici curiae and filed a written “suggestion” to the court, that the existence of Manufacturing Lumbermen’s Underwriters, the sole defendant in said case, had been terminated both in fact and at law by a decree and judgment in the circuit court of Jackson County, Missouri, on the 1st day of April, 1937, and that the superior court of Brooks County was without power to enter any valid judgment against said nonexistent defendant. The court overruled the “suggestion” and ordered the case to proceed to trial. “The attorneys of record appearing as amici curiee” excepted pendente lite, and now assign error upon the pendente lite exceptions. Upon the trial of the ease, the judge directed a verdict in favor of thé plaintiff for the full amount of principal sued for, interest, and costs. The defendant filed a motion for a new trial which was overruled, and on this judgment the defendant assigns error.
R. E. O’Malley, superintendent of the insurance department of the State of Missouri, filed a motion in this court in *700 which he “ prays that he be made a plaintiff in error.” The second paragraph of his motion is as follows: “Being the person in whom was vested, at the day of the trial, the title to all property of the defendant company, and the judgment binding a part of said property, the said B. E. O’Malley is a party at’interest entitled to appear in this court.” The motion thus shows on its face that the title to the property of the defendant company was in the movant at the time of the trial, and yet it does not appear that the movant made any effort to be made a party defendant in the trial court. We know of no rule of law or of this court which would authorize the making of a party in the Court of Appeals, where the same alleged reasons for making him a party in the Court of Appeals existed when the case was in the trial court and no effort was made in the lower court to make him a party. The movant did not see fit to intervene in the trial court, and his motion to be made a plaintiff in error is denied.
The paper denominated '“suggestion,” in which certain statutes of Missouri were quoted, and in which it was alleged that the Manufacturing Lumbermen’s Underwriters had been declared insolvent by a judgment of a court in Missouri, that B. E. O’Malley, superintendent of the insurance department of the State of Missouri, was vested with the assets of said corporation, that the corporation had ceased to exist, and that the trial court was “without power to enter any valid judgment” against the defendant, was not filed in behalf of the defendant, but was filed by attorneys as amici curiae, and the same attorneys “had theretofore appeared generally for the defendant Manufacturing Lumbermen’s Underwriters,” and, after the “suggestion” was overruled, they appeared as attorneys for the defendant in the trial of the case, and they appear as attorneys for the defendant (now plaintiff in error) in this court. It thus appears that the defendant, though alleged to be dead, after its demise actively contested and still contests the claim of the plaintiff. In an exhibit attached to the suggestion certain statutes of the State of Missouri pertaining to the dissolution of insurance companies were cited. The exhibit also set forth a judgment and decree of the circuit court of Jackson County, Missouri, dissolving the Manufacturing Lumbermen’s Underwriters. Conceding, but not deciding, that the dissolution of the company was properly shown by the suggestion and its ex- *701 Mbit, the court did not err in overruling the suggestion and in ordering the trial to proceed. Under the law of Georgia, the death of a nonresident fire-insurance company does not terminate a suit such as the instant one. Under the Code, § 56-301 et seq., nonresident fire-insurance companies doing business in this State are required to deposit certain bonds with the treasurer of the State. These bonds are for the protection of the citizens of Georgia who have insurance with the nonresident company, and if the foreign company ceases to do business, the bonds remain in the State treasury until such company “shall have settled all claims against it55 in this State, and are subject to the claims of Georgia citizens under certain prescribed conditions. As long as there are any claimants to these bonds under the laws of Georgia, a receiver in Missouri would have no right to interfere with proceedings of the courts of Georgia instituted to assert the rights of a Georgia claimant in whose behalf the bonds were deposited with the State treasurer.
In Kelsey v. Cogswell, 112 Fed. 599, it is held: “Code Ga. 1895, §§ 2035-2043, require fire-insurance companies doing business in the State to make a deposit with the State treasurer to secure the people against loss by the operation of said companies. They provide the method by which the liability of a company for 'any loss insured against5 may be enforced against such deposit; and section 2041 provides that any claims of citizens of the State 'for losses, or on existing policies where no losses have occurred/ must be settled before the deposit can be withdrawn. Held, that the primary purpose of the deposit, under such provisions, is to secure the payment of fire losses, which are the only losses 'insured against/ although it also secures, secondarily, other claims arising on policies, such as the repayment, after the termination of the risk, of unearned premiums paid; that even when a company becomes insolvent, and the deposit is brought into a court of equity for distribution, fire losses are entitled to priority of payment from the fund over claims for unearned premiums.55 The “statement of the case55 (p. 600), on which the above holding is based, shows that “the Manhattan Fire Insurance Company, a corporation of New York State, transacting business in the State of Georgia and elsewhere, was duly declared to be insolvent by a judgment of the Supreme Court of the State of New York, and under the statutes *702 of said State an action was instituted in the name of the people of the State of New York to obtain a judgment dissolving said corporation, forfeiting its charter, corporate rights, privileges, and franchises.” This, in principle, is exactly what transpired in the instant case, so far as is shown by the record. Code, § 22-1210, is as follows: <cThe dissolution of a corporation either as a result of the expiration of its charter, or for any other cause, shall not bring about its total extinction nor operate to extinguish any demand or cause of action against it in favor of any person whomsoever, whether arising from contract or tort, nor shall such dissolution work the abatement of any suit pending against it at the time of such dissolution, but all such pending suits may be prosecuted and enforced to a conclusion as though such corporation were still undissolved.”
An insurance company which complies with the laws of Georgia in order to do business in Georgia, is subject to the laws of the State prescribing the conditions under which it may do business and to the statutory remedies against such corporations. E. E. O’Malley, superintendent of the insurance department of the State of Missouri, did not attempt to be made a party to the pending case in Brooks County, Georgia, and the attorneys for the defendant company did not see fit to file a plea setting forth the dissolution of the defendant as a corporation. Whether they could have sustained such a plea by proof would be purely conjectural as no legal evidence was submitted in support of the “suggestion.” Since the receiver did not intervene in the court below, counsel for the plaintiff in error in this court are in the anomalous position of apparently representing one who is not a party to the case. Who knows that the defendant has ceased to exist as a corporation? There is no proof of .this, since the mere allegations in the so-called. '“suggestion” can not be considered as evidence. However, if the defendant were dissolved, under Code, § 22-1210, above quoted, its dissolution would not operate to extinguish the demand or cause of action against it in this State, and “pending suits may be prosecuted and enforced to a conclusion as though such corporation were still undissolved.” See also Dixie Mfg. Co. v. Ricks, 153 Ga. 364, 370 (112 S. E. 370). The law as embodied in this Code section seems to be the settled policy in this State. The case of Venable v. Southern Granite Co., 135 Ga. 508 (69 S. E. *703 822, 32 L. R. A. (N. S.) 446), cited by counsel for plaintiff in error, was decided eight years before the passage of the act codified in this section. However, even before the passage of that act, the Supreme Court of this State recognized the principle now embodied in this section. In the Venable case it was said: “It has been held in many cases that if a corporation becomes extinct pending a suit to which it is a party, the suit thereby abates as to such corporation, and any judgment thereafter rendered against it is a nullity, unless some provision is made for the further prosecution of the suit by the laws of the State in which the suit is pending (Italics ours.) Distinct provision is now made in Georgia for the further prosecution of such a suit. The bonds which a foreign corporation doing business in this State is required to deposit with the State treasurer, are to prevent a suit against a dissolved corporation from being futile and unavailing; and a suit brought in a local court is a condition precedent to the appropriation of the bonds held by the State treasurer to the payment of a fire loss such as in the instant case. The statute as to the depositing of these bonds and retaining them so long as there is- a pending claim in the State, and the statute providing for the prosecution of pending suits after the dissolution of a foreign corporation, are a part of the general scheme of our Georgia law to protect Georgia citizens in the collection of just claims against foreign corporations which are dissolved and which have their principal assets in another State. In Clark v. Williard, 294 U. S. 211 (55 Sup. Ct. 356, 79 L. ed. 865, 98 A. L. R. 347), headnotes 1 and 2 are as follows: “1. Every State has jurisdiction to determine for itself the liability of property within its territorial limits to seizure and sale under the process of its courts. 2. A State may provide that the local assets of foreign and domestic corporations shall remain subject to be attached by creditors after the corporations have become insolvent and have been dissolved.”- This court will take judicial cognizance of the Georgia statute providing for the deposit of bonds by a foreign fire-insurance company doing business in this State. The judgment obtained by the plaintiff will not be a lien upon any property of the defendant company which is located in Missouri; but it is a condition precedent to the exercise of the right to “file an application with the judge of the superior court of the county where the case was tried, for a receiver to take charge of as many *704 bonds as shall be necessary to satisfy the aforesaid judgment.” Code, § 56-302. The court did not err in its rulings complained of in the exceptions pendente lite.
The substance and effect of the special grounds of the motion for new trial are that the verdict directed was not demanded by the evidence. The policy sued on covered various properties of the South Georgia Railway Company, aggregating $51,425; and schedule No. 1 of the policy contains the following provision: “$23,950 — on buildings: viz.: passenger and freight-station houses, warehouses, storehouses, and their platforms attached thereto, section houses, dwelling houses, and other miscellaneous buildings or structures not coming under the headings of the other schedules and not occupied for manufacturing purposes.” Included in the list of properties under this schedule No. 1, showing the amount of coverage on each building in this schedule, is the following: “Quitman, Ga. Scriven St. Whse. $3000.” This was the building destrojred by fire. The undisputed evidence shows that the loss was in excess of $7000, though the coverage was only $3000. The defendant insurance company contends that it is not liable because the building had been occupied for manufacturing purposes, that the defendant company had no notice that the building was occupied for manufacturing purposes, that the insurance agents who handled the matter at Quitman, Georgia, were not the agents of the defendant company, and that they were the agents of the insured. We are convinced that the clause “and other miscellaneous buildings or structures not coming under the headings of the other schedules and not occupied for manufacturing purposes,” embodied in the provision of the policy above quoted, properly construed, does not refer to the buildings specifically named in this schedule, but refers to “other” miscellaneous structures which are not specifically scheduled, and which may have been overlooked. Since the schedule specifically names certain structures, and concludes by saying “and other miscellaneous structures,” it necessarily means other structures not specifically named. Especially is this true in view of the punctuation in this provision of the policy. This building was not some “other miscellaneous building” not named, but was specifically included in the schedule of buildings actually insured, and was specifically insured by the policy regardless of the purpose for which it was used. Even if *705 this provision of the policy were ambiguous, it would be construed most strongly against the insurance company which wrote it. The insured did not write the policy. The insured only furnished a list of the buildings it wished insured and the amount of insurance desired on each, and from this data the defendant company prepared the policy.
However, since this building was specifically named and insured in the policy, the construction of this provision of the policy is immaterial in the light of the evidence, as hereinafter shown, because it appears therefrom that the company issued the policy with notice of the use of the building. 0. F. Cater testified in part: “In 1935 and 1936 I was auditor and treasurer for the South Georgia Eailway Company. In July, 1935, I took out this policy for the South Georgia Eailway Company. This is an omnibus policy of insurance on all of the buildings up and down the line owned by the South Georgia Eailroad. Before I took out the policy, I prepared a schedule listing the buildings and equipment and the values I wished them insured for, and submitted them to all of the agents in Quitman who wrote insurance. I submitted the schedules to McDonald & Cobb, A. L. Tidwell, W. B. Holwell, and Denmark Groover. That is the paper which I prepared and submitted, and I made four copies of it and submitted one to each of the four agents named. Upon this schedule the description of the building, for which destruction by fire this suit was brought, was described 'Quitman, Ga., Seriven Street, warehouse —$3000.’ This indicates the amount of insurance I desired, and the purpose of furnishing this memorandum to the agents was to obtain as low a rate as possible. I received bids from all of the agents to whom I submitted the schedule as to how much it would cost the railroad to insure these buildings and the personal property designated therein. It was as a result of this preliminary, activity that this policy was written by McDonald & Cobb. I paid the premium in the sum of $316.26 for one year, to McDonald & Cobb, agents. . . The business of preparing feed, mixing food for cows, chickens, and stock foods, was carried on in this building, I think. . . This building has been used for this purpose by the Suwannee Milling Company for three or four years at least before this policy was taken out. . . I would estimate the damage to the market value of the building, taking into consideration *706 the value of what was left of the building, to be $7500. . . At that time the Manufacturing Lumbermen’s Underwriters had an agent here — McDonald & Cobb. They were agents for the Company at the time this policy was issued. . . When the amount was quoted me by Mr. McDonald, it was for just a total sum for the insurance. . . There was no difference made in the buildings used for manufacturing purposes or processing and any other buildings.” He also testified that he had no relation whatsoever with the Charles-Parrott Agency of Atlanta.
D. B. McDonald, of the insurance agency of McDonald & Cobb, of Quitman, Ga., testified that his agency brokered the business; that “We just copied that schedule, and we sent copies to different companies that we thought would be interested, and told them what rates we thought it would take to get the business, and they accepted it at that rate and prepared the policy in Atlanta. They authorized us to deliver it. When you broker insurance, the policy is sent to the agent handling it and he delivers it. . . The Charles-Parrott Agency in Atlanta finally authorized us to quote to Mr. Cater certain prices. . . This is the policy they sent me. I delivered it to the South Georgia Eailway Company, which paid me by check to McDonald & Cobb. Here is a copy of the letter where I sent it [the schedule of the buildings which the plaintiff wished insured and the amount of insurance desired on each] to Charles-Parrott Agency, and as a result of that this policy was issued by the defendant and delivered to the South Georgia Eailway Company. . . I knew that it [the building burned] had been used for many years for the processing of feed. . . The book you hand me is an insurance rate book. I had it in my possession at the time the policy of insurance was written. It contains a description of the buildings and location and insurance rates as compiled by the Southeastern Underwriters Association. . . On the last page there is a description of the Suwannee Milling Company, 708 E. Seriven St., north side, that was destroyed by fire. . . The map handed me marked ‘Insurance map, Quit-man, Ga.,’ loaned to McDonald & Cobb, Quitman, Ga., by the Southern Map Company, shows on page 4 the location and construction of the Suwannee Milling Company. That is the building that was burned, and I had this in my possession at the time. . . I received a commission from Manufacturing Lumbermen’s *707 Under-writers, on April 2, 1936, -which was before the fire. . . I delivered it [the policy of insurance] and received the premium. I deducted our commission . . and sent it to the Oharles-Parrott Agency. I deducted commission for handling the insurance. . . The South Georgia Kailway Company did not pay. me anything. I charged the commission for securing the coverage. . . I got the insurance and the Charles-Parrott Agency placed it, and we split the commission.”
The defendant company proved that part of the building burned was used for manufacturing or processing different kinds of food stuffs, and that part of it “was used as a warehouse for the storing of this mixed stuff.” Neither the brokerage of the insurance by the local agent with an Atlanta agency, nor the use of part of the building for manufacturing or processing food stuffs, both of which are admitted, raises any issue of fact for the jury, because, under the undisputed evidence as applied to the law, the local or resident agent represented the defendant insurance company in this transaction, and he had knowledge, at the time the policy was written, that the building was used for processing food stuffs. His knowledge of this was imputable to the defendant insurance company which he represented. The undisputed evidence shows that McDonald & Cobb procured the application for the insurance; that as a result of their efforts in sending out the list of buildings and the amount of insurance desired, the policy was issued by the defendant company; that they delivered the policy to the insured; and that they received the premium from the insured. “Any person who shall solicit in behalf of any insurance company, or agent of the same, incorporated by the laws of this or any other State or foreign government, or who shall take or transmit, other than for himself, any application for insurance or any policy of insurance to or from such company or agent of the same, . . or who shall receive or deliver a policy of insurance of any such company . . or receive or collect or transmit any premium of insurance, . . or do or perform any other act or thing in the making or consummating of any contract of insurance for or with any such insurance company, . . whether any of such acts shall be done at the instance or request or by the employment of such insurance company, or of, or by, any broker or other person, shall be held to be the agent of the company for *708 which the act shall be done or the risk shall be taken.” (Italics ours.) Code, § 56-501. Clearly under this statute and the undisputed evidence, McDonald & Cobb were the agents of the defendant company. Nor is there any evidence to show, as contended by plaintiff in error, that McDonald & Cobb were the agents of the insured. The insured submitted the list of buildings it wanted insured to McDonald & Cobb, just as it did to all the other insurance agents in town. McDonald & Cobb procured a company who would and did write the insurance at a satisfactory rate. The insured paid the premium in the usual way to the agent of the insurance company who took the application and delivered the policy. This premium belonged to the insurance company, and it was from this premium that the commission of McDonald & Cobb was paid. McDonald testified that he deducted his firm’s commission before remitting the premium, and that “the South Georgia Eailway Company did not pay me anything.” The cases relating to a dual agency are not applicable to the instant case, because there is no evidence to show that there was a dual agency or to take the case out of the usual method of dealing so far as the relation between the insured and the agent of the insurance company is concerned. The building destroyed by fire was used for manufacturing or processing purposes before and at the time the policy was written; and since McDonald & Cobb were the agents of the insurer, and knew that the building was so occupied and used, as shown by the evidence, their knowledge that the building was used for manufacturing or processing food stuffs was imputable to the insurer. Atlanta Home Insurance Co. v. Smith, 136 Ga. 592 (71 S. E. 902); Athens Mutual Ins. Co. v. Ledford, 134 Ga. 500 (68 S. E. 91); Metropolitan Life Ins. Co. v. Hale, 177 Ga. 632 (170 S. E. 875); Globe & Rutgers Fire Ins. Co. v. Walker, 150 Ga. 163 (103 S. E. 407); Brown v. Globe & Rutgers Fire Ins. Co., 161 Ga. 849 (133 S. E. 260); National Life & Accident Ins. Co. v. Sneed, 40 Ga. App. 131 (2, 3) (149 S. E. 68); Rome Ins. Co. v. Thomas, 11 Ga. App. 539 (4) (75 S. E. 894); Johnson v. Ætna Ins. Co., 123 Ga. 404 (51 S. E. 339, 107 Am. St. R. 92).
Counsel for plaintiff in error insist that the knowledge of McDonald & Cobb was not imputable to the defendant company because McDonald testified: “We did not Write that policy at all. *709 We brokered it. We just copied that schedule and we sent copies to different companies that we thought would be interested and told them about what rates we thought it would take to get the business, and they accepted it at that rate and prepared the policy in Atlanta. . . When you broker insurance, the policy is sent to the agent handling it and he delivers it.” And they cite as authority the act of 1935, pages 139-et se'q., which amends the insurance title of the Code of 1933, by striking § 56-508 and substituting a new section providing that no licensed fire insurance company shall issue a policy except through a licensed resident agent. There is no merit in this contention. The inhibition contained in the substituted section is against any one, other than a licensed fire-insurance agent, writing or issuing a policy. It is not contended that the Charles-Parrott Agency of Atlanta was not a licensed fire-insurance agent for the defendant company, and it is undisputed that this licensed agent of the defendant company wrote the policy and sent it to McDonald & Cobb, resident agents of Quitman, Georgia, “engaged in the solicitation of such business from the public generally” (Ga. L. 1935, p. 140), who delivered it to the insured, and the commission was divided between the Quitman agent and the Atlanta agent. And this was in compliance with the act of 1935, cited by plaintiff in error, which, on page 140, provides that “the full commission thereon (meaning thereby the commission paid for the production of business by him) shall be paid to such resident agent. Provided, however, that such resident agent may pay a commission on business placed with him by another duly licensed resident agent.” The act of 1935 does not attempt or purport to change Code, § 56-501, hereinbefore set out, which provides that one who receives the application or delivers the policy, or does anything in furtherance of the insurance contract, “shall be held to be the agent of the company.” The facts of the instant case render inapplicable the authorities cited by the plaintiff in error.
The court did not err in overruling the motion for new trial.

Judgment affirmed.

MacIntyre and Guerry, JJ., concur.